## STATE EX REL. THOMAS E. CASSILL v. HARRY H. PETERSON.[1]

March 22, 1935.

No. 30,133.

[1]Reported in 259 N. W. 696.

*Harry H. Peterson,* Attorney General, *Harry W. Oehler,* Deputy Attorney General, and *David J. Erickson* and *Matthias N. Orfield,* Assistant Attorneys General, for appellant (respondent below).

*Victor J. Michaelson,* for respondent (relator below).

JULIUS J. OLSON, JUSTICE.

The attorney general appeals from an order denying his motion for new trial in a *mandamus* proceeding wherein the trial court ordered the issuance of a peremptory writ. We shall refer to the parties upon appeal the same as below, that is to say, Mr. Cassill will be referred to as relator, and the attorney general as respondent. Unless otherwise indicated, we shall refer to 1 Mason Minn. St. 1927, §§ 4368, 4369, also L. 1931, c. 347, as the "veterans acts."

Relator was appointed an accountant in the inheritance tax department of the attorney general's office in October, 1915, by the then attorney general and continued in that service until he was refused further employment by respondent. His employment was for no fixed or definite term but was to continue at the pleasure of the attorney general. Relator, an honorably discharged soldier, claiming to be entitled to the benefits of the veterans acts referred to, brought this proceeding in *mandamus* to compel respondent to "reinstate or appoint" him to the position formerly held by him. He asserts that he was succeeded in office by one Sipkins, not an honorably discharged soldier, and as such relator was possessed of a superior right to that position and that respondent violated the veterans acts in failing and refusing to "reinstate or appoint" him. He claims to be thoroughly qualified for the position and avers that no charge has ever been made against him in any way questioning his capacity to serve. Respondent by verified return and answer pleaded that by virtue of his office he was under the law empowered to employ such assistants, whether lay, legal, or expert, as he might deem necessary for the interests of the state in conducting its legal affairs; that relator's term expired December 31, 1932, that being the date when the former attorney general's official term expired; that the relationship between the person employed as inheritance tax examiner and the attorney general must be

strictly confidential; that relator had waived his veteran's preference rights in an oral conversation with respondent; and that the position of inheritance tax examiner was that of a deputy to the attorney general. Respondent also claimed that he had made investigation respecting relator's qualifications and had found and determined that relator could not perform the duties of the office in a satisfactory manner; and, finally, that the veterans acts do not apply to appointments and removals made by him in his official capacity.

After a hearing below at which much testimony was taken, the court concluded that relator had established his cause and that no lawful ground existed justifying respondent's refusal to reappoint or reëmploy relator in the particular service theretofore performed by him. Several issues are presented by respective counsel. We shall discuss but one: Was relator's position one involving confidential relations with the attorney general so as to bring about a situation where the exception under the veterans acts is available? To determine this question, the lower court having found the facts contrary to respondent's contentions, a brief résumé of the evidence covering this phase of the case seems appropriate.

The statutory duties imposed upon the attorney general respecting the determination and collection of inheritance taxes may be found in 1 Mason Minn. St. 1927, §§ 2297 to 2314, inclusive. Reference should also be had to L. 1933, c. 335, and L. 1931, c. 332. Under 1 Mason Minn. St. 1927, § 2297, the attorney general or his assistant in charge of the inheritance tax department is required to file and enforce statutory liens respecting such taxes. Under § 2302 he has original jurisdiction in respect of nonresident estates to determine values and the tax to be imposed. When proper he may issue consents to the transfer of property without payment of tax if he is satisfied no tax is due on such property. Under § 2304 he may apply to the probate court for letters of administration with the same right as a creditor if he deems such application desirable. Section 2307 directs him to scrutinize, consider, weigh, and accept or reject appraisals. Section 2309 directs him to scrutinize, weigh, accept, or reject the determinations of taxes fixed by

the various probate courts throughout the state. Section 2310 gives him authority to object to any tax determination made by the probate court. Under § 2312 he is authorized to examine and to consider reports from the registers of deeds relative to transfer of property which appears to have been made or intended to take effect in possession or enjoyment after the death of the grantor or vendor. Section 2313 authorizes him to enter into agreements with trustees of estates in which remainders or expectant estates are of such nature that the taxes are not presently payable or where the interests of the legatees are not ascertainable at the time fixed for the appraisal and determination of the tax. Section 2314 authorizes him to issue citations to persons whom he believes to have knowledge or information concerning property subject to taxation. He may require the production of books, records, accounts, and documents in the possession of such person or under his control. He may even inspect and examine books, records, and accounts of corporations, "including the stock transfer books of any corporation," for the purpose of informing himself with regard to the proper enforcement of inheritance taxes. That section further provides that "any and all information acquired by the attorney general under and by virtue of the means and methods provided for by this section shall be deemed and held by him as confidential and shall not be disclosed by him except so far as the same may be necessary for the enforcement and collection of the inheritance tax provided for by this act." Under L. 1933, c. 335, and 1 Mason Minn. St. 1927, § 2315, he has the power to determine the amount of refund, if any, that may be due from taxes paid upon future, limited, or contingent estates. L. 1931, c. 332, directs him to administer in its entirety the estate tax law. There are many other duties resting upon the attorney general. To recapitulate these is unnecessary. The same will be found appropriately indexed in 2 Mason Minn. St. 1927, index, pp. 2322, 2323.

The trial court found on this phase of the case as follows:

"That the work performed by said relator as inheritance tax examiner consisted of computing inheritance taxes, verifying the correctness of figures contained in reports and orders submitted

by various judges of probate to the inheritance tax division, and other routine work in connection with inheritance tax matters, such work being in part clerical and in part technical clerical work of a public nature and neither of a secret nor of a strictly confidential nature to the attorney general. That the holder of said position is neither an officer of the state, head of a department, private secretary or deputy of any official or department of the state, nor a person holding a strictly confidential relation to the appointing officer, but is an employe of the state within the terms of the Veterans Preference Act."

The question is whether this finding is sustained by the evidence. An examination of the record indicates clearly that relator's duties were much more than merely clerical or technical. The testimony indicates that he checked upon inventories and the valuation fixed therein; that he construed wills and testate laws; that he prepared blanks upon which the final applications were made in the matter of estate tax laws and made computations in conformity with such; that he acted in an advisory capacity in tax matters with probate judges and checked the records; that he found such records frequently inaccurate and assisted in the making of necessary corrections. He and his coworker, one Mr. Brown, construed wills and prepared composition agreements; that in the city of Mankato there were discovered 60 cases where taxes should have been imposed and that relator and his coworker did all the work that was necessary to be done in the department. Prior to the commencement of this cause relator set forth his duties in an exhibit, respondent's exhibit 2, introduced in evidence. Amongst other things the following appears:

Q. "If your work requires judgment and reflects responsibility upon the department, describe fully in what manner and to what extent.

A. "Requires that judgment be used in the construction of complicated wills from all states of the union and from foreign countries, placing of values on property, exclusion of items which are not proper deductions before determination of the inheritance tax,

etc., in order to collect all taxes to which the state is entitled and still avoid litigation. Responsible for correct determination of the tax and collection thereof."

The following appears in relator's exhibit E, being the statement of relator's coworker Brown:

Q. "If your work requires judgment and reflects responsibility upon the department, describe fully in what manner and to what extent.

A. "Determining whether objections to appraisers' values should be made, also to deductions made when computing the tax, and also whether distribution of estate under a will has been properly made so that full tax has been assessed."

While relator claimed that interpreting wills was clerical, it is obvious that the work was much more than that.

As we have seen, the attorney general is under the inheritance tax laws made responsible for the conduct of assistants appointed to discharge the duties of that office. It would therefore seem conclusive that such officer being responsible should have the right and prerogative of satisfying himself of the integrity and reliability of an appointee who is necessarily in close fiduciary relation to him.

The attorney general may be a member of a different political party from that of the other state officers. That has happened in the past and may happen again. It he were to be compelled to accept the employes of his predecessor in office, whose work he perhaps may have criticized in his campaign for election, it necessarily would follow that the attorney general would be handicapped in doing the duties that he conceived to be his and which the electors had determined should be in his hands for determination and prosecution. It is difficult indeed to conceive of a situation where everything that happens in a law office between attorney and client is not in confidence. That is the very basis for successful practice of the law and so considered by every lawyer. The attorney general represents the sovereign state and the people thereof. Having been chosen by them to perform the statutory and constitutional duties devolving upon that office and being charged

with the responsibility of making effective such other duties as the legislature may from time to time impose upon him, he should be free to make choice of those whom he wishes to be his assistants and subordinates. The importance of the office forbids the thought that the attorney general is to be charged with the burdens of taking over assistants and subordinates of his predecessor in office, especially where, as here, the subordinate holds a position clearly confidential in its every purpose. Essential to the efficiency and independence of the office is the power to appoint and remove them. Not only confidential relationship between the chief law officer and his subordinates but likewise devotion to the duty that the attorney general wishes to impose upon them require the power to exact loyal obedience. It is unthinkable that the legislature intended to take away from him this essential right, nor do we believe that the legislature so intended. So to construe legislative intent might disrupt the efficiency of his official work and cause irreparable harm to that very important branch of the public service.

At the same legislative session that L. 1931, c. 211, was enacted, c. 347 was also enacted, the former being approved April 18, 1931, the latter April 25, 1931. Under the former the attorney general is given power to appoint and "at his pleasure remove" deputy and assistant attorneys general. And to him was given thereby the additional power "to employ such assistants, whether lay, legal, or expert, as he may deem necessary for the protection of the interests of the state through the proper conduct of its legal business." The language of c. 347 could not have been intended to make for naught the provisions just referred to, there being absent in the later act anything indicating a limitation upon the authority of the former.

The cases relied upon by relator, such as State ex rel. Castel v. Village of Chisholm, 173 Minn. 485, 217 N. W. 681, and State ex rel. Tamminen v. City of Eveleth, 189 Minn. 229, 249 N. W. 184, and others of similar nature are not in point. A mere reading of the same will convince any mind that there is a clear distinction be-

tween the facts appearing in those cases and the facts with which we are here dealing.

It follows that the order must be reversed and the lower court instructed to dismiss the proceedings. So ordered.

HILTON, JUSTICE, took no part.

